ORIGINAL

AO 93 (Rev. 12/09) Search and Seizure Warrant  (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No. |
| Information associated with account identified as | ) | |
| fjr@easportsmanagement.com that is stored at premises | ) | |
| controlled by GoDaddy.com, Inc. | ) | |

**15-0355M**

2015 APR -9  AM 10: 29
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

FILED

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ District of _____Arizona_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See Attachment B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.  Such affidavit is incorporated herein by reference.

**YOU ARE COMMANDED** to execute this warrant on or before     __14 days from the date of its issuance__
                                                                    *(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.     ☐ at any time in the day or night as I find reasonable cause has been
                                                established.

You must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.
_____
                *(name)*

IT IS FURTHER ORDERED that the Provider named in Attachment A shall comply with the further orders set forth in Attachment B, and shall not notify any person, including the subscriber(s) of each account identified in Attachment A, of the existence of the warrant.

Date and time issued:     3/4/15  1402        _____
                                                        *Judge's signature*

City and state:     Los Angeles, California        Michael R. Wilner, U.S. Magistrate Judge
                                                        *Printed name and title*

AUSA:Christopher C. Kendall  CK

*AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)*

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed:<br>3/5/15          1:25 PM | Copy of warrant ~~and inventory~~ left with:<br>GODADDY.COM |
| Inventory made in the presence of : | | |

Inventory of the property taken and name of any person(s) seized:
[Please provide a description that would be sufficient to demonstrate that the items seized fall within the items authorized to be seized pursuant to the warrant (e.g., type of documents, as opposed to "miscellaneous documents") as well as the approximate volume of any documents seized (e.g., number of boxes). If reference is made to an attached description of property, specify the number of pages to the attachment and any case number appearing thereon.]

Warrant Faxed and Received by GoDaddy.com
Received Response from GoDaddy.Com on 4/8/15
Containing 2 CD's marked GD 000001 - GD 000413
and GD000414 referencing their GDG No. 15-16567.
These CD's contained emails related to the requested
account information of fjr@easportsmanagement.com.

**Certification** (by officer present during the execution of the warrant)

I declare under penalty of perjury that I am an officer who executed this warrant and that this inventory is correct and was returned along with the original warrant to the designated judge through a filing with the Clerk's Office.

Date:   4-9-15

_____
Executing officer's signature

H.R. WALDHEIM, SA, FBI
_____
Printed name and title

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

This warrant applies to information associated with the account identified as fjr@easportsmanagement.com (the "SUBJECT ACCOUNT") that is stored at premises controlled by GoDaddy.com, Inc., a company that accepts service of legal process at 14455 North Hayden Road, Suite 219, Scottsdale, Arizona 85260.

## ATTACHMENT B

### ITEMS TO BE SEIZED

**IV.   SEARCH PROCEDURE**

1.    The search warrant will be presented to personnel of GoDaddy.com, Inc. (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2.    To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.    The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the agent who serves the search warrant.

4.    With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.10.a below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant.  The search shall extract and seize only the specific items to be seized under this warrant (see Section III below).  In conducting this search, the search team shall take notes regarding how it conducts the search.

5.    If the search team encounters immediately apparent contraband or other evidence of a crime outside the scope of the

i

items to be seized, the team shall immediately discontinue its search pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

6.    The search team will complete its search of the content records as soon as is practicable but not to exceed 60 days from the date of receipt from the PROVIDER of the response to this warrant. If additional time is needed, the government may seek an extension of this time period from the Court within the original 60-day period.

7.    Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the Court. Thereafter, the search team will not access the data from the sealed original production which fell outside the scope of the items to be seized absent further order of the Court.

8.    The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

9.    Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

## V.   INFORMATION TO BE DISCLOSED BY THE PROVIDER

10.   To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each SUBJECT ACCOUNT listed in Attachment A:

a.   All contents of all wire and electronic communications associated with the SUBJECT ACCOUNT, limited to that which occurred on or after August 1, 2010, including:

i.   All e-mails associated with the SUBJECT ACCOUNT, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, and deleted e-mails, as well as all header information associated with each e-mail, and any related documents or attachments.

ii.   All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken.

b.   All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNT described above in Section II.10.a, including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations.

c.   All subscriber information pertaining to the SUBJECT ACCOUNT, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), other account names or e-mail addresses associated with the account, telephone numbers, physical addresses, and other identifying information regarding the subscriber, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment, including detailed billing records.

## VI.   INFORMATION TO BE SEIZED BY THE GOVERNMENT

11.   For each SUBJECT ACCOUNT listed in Attachment A, the search team may seize:

a.   All information described above in Section II.10.a that constitutes evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1343 (Wire Fraud), 1029(a)(5) (Access Device Fraud), and 1028A (Aggravated Identity Theft), those violations involving FRANCISCO JAVIER ROBLEDO, JR., also known as ("aka") Frank Robledo ("ROBLEDO"), and occurring after August 1, 2010, namely:

i.   Information relating to who created, accessed, or used the SUBJECT ACCOUNT, including records about their identities and whereabouts.

ii.  Communications between the SUBJECT ACCOUNT and other email accounts involving M.H., Mountain American Credit Union ("MACU"), USAA Investment Management Company

iv

("USAA"), Purdue Federal Credit Union ("PFCU"), M.H.'s investments, M.H.'s investment accounts, M.H.'s bank accounts, M.H.'s credit card accounts, M.H.'s debit card accounts, ROBLEDO's mortgage payments, ServCorp, and the United States Securities and Exchange Commission ("SEC").

   b.   All records and information described above in Sections II.10.b and II.10.c.

## VII. PROVIDER PROCEDURES

   12.   IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section II within 10 days of the service of this warrant.   The PROVIDER shall send such information to:

   Henry R. Waldheim
   1050 Lakes Drive, Suite 350
   West Covina, CA 91790
   Phone: (626) 931-5544
   Fax: (626) 931-7070
   Email: Henry.Waldheim@ic.fbi.gov

   13.   IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant.

   14.   IT IS FURTHER ORDERED that the PROVIDER shall not notify any person, including the subscriber(s) of each account identified in Attachment A, of the existence of the warrant.

**AFFIDAVIT**

I, Henry R. Waldheim, being duly sworn, declare and state as
follows:

## I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the Federal Bureau of
Investigation ("FBI"), and have been employed in that capacity
for seven years.  From January 2008 through January 2011, I was
an investigator of white collar crimes within the Pittsburgh
Division of the FBI.  During that time, I was assigned as an
investigator and the primary coordinator for a mortgage fraud
task force, which successfully indicted more than 87 criminal
subjects.  I participated and testified as an expert witness in
three trials while also serving as an active member of the
Pittsburgh Division SWAT Team.  In January 2011, I was assigned
to the Los Angeles Field Office ("LAFO") Riverside Resident
Agency ("RVRA") where I was assigned as a criminal investigator
of white collar crime and bank robberies.  From August 2012
through January 2014, I was assigned as the Primary Bank Robbery
Investigator for the RVRA.  In that capacity, I investigated
more than 100 bank robbery cases, assisted on other bank robbery
cases with the LAFO, worked jointly with other law enforcement
agencies, and assisted in arresting more than 30 subjects.  From
January 2014 through the present, I have been assigned to the
LAFO West Covina Resident Agency ("WCRA") white collar crime
division.  I have participated in several LAFO violent crime
gang affiliated take downs, and various search warrants and
arrest warrants.

2.     I make this affidavit in support of an application for a search warrant for information associated with the account identified as fjr@easportsmanagement.com (the "SUBJECT ACCOUNT") that is stored at premises controlled by GoDaddy.com, Inc.(the "PROVIDER"), a provider of electronic communication and remote computing services, headquartered at 14455 North Hayden Road, Suite 219, Scottsdale, Arizona 85260.[1]  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A) and 2703(d) to require the PROVIDER to disclose to the government copies of the information (including the content of communications) described in Section II of Attachment B.  Upon receipt of the information described in Section II of Attachment B, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items

---

[1] Because this Court has jurisdiction over the offenses being investigated, it may issue the warrant to compel the PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider . . . pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction") and 2711 ("the term 'court of competent jurisdiction' includes -- (A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated; (ii) is in or for a district in which the provider of a wire or electronic communication service is located or in which the wire or electronic communications, records, or other information are stored; or (iii) is acting on a request for foreign assistance pursuant to section 3512 of this title").

described in Section III of Attachment B.  Attachments A and B
are incorporated herein by reference.

3.     As described more fully below, I respectfully submit
there is probable cause to believe that the information
associated with the SUBJECT ACCOUNT constitutes evidence,
contraband, fruits, or instrumentalities of criminal violations
of Title 18, United States Code, Sections 1343 (Wire Fraud),
1029(a)(5) (Access Device Fraud), and 1028A (Aggravated Identity
Theft) (the "SUBJECT OFFENSES").

4.     The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from other agents and witnesses.  This
affidavit is intended to show merely that there is sufficient
probable cause for the requested warrant and does not purport to
set forth all of my knowledge of or investigation into this
matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

## II.  SUMMARY OF INVESTIGATION

5.     FBI is currently investigating an investment fraud and
access device fraud scheme operating in Los Angeles, California.
FRANCISCO JAVIER ROBLEDO, JR., also known as ("aka") Frank
Robledo ("ROBLEDO"), is suspected of devising and executing a
scheme to defraud M.H. of money by false and fraudulent
pretenses, representations, and promises, as well as the
concealment of material facts.  In addition, ROBLEDO is
suspected of using M.H.'s means of identification for his own

3

monetary gain.  As set forth below, the SUBJECT ACCOUNT has been identified as an e-mail account that was used to facilitate ROBLEDO's fraudulent scheme.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

### I.   <u>Background and Summary</u>

6.   Based on my review of reports, electronic communications, records, conversations with M.H., and my personal participation in this investigation, I learned the following:

   a.   M.H. is a professional golfer and member of the Ladies Professional Golf Association ("LPGA"), who resides in San Diego, California.

   b.   In or around August of 2010, ROBLEDO contacted M.H. for the purpose of offering his services as a sports agent.

   c.   ROBLEDO lives at 206 North Walnuthaven Drive, West Covina, California 91709 ("Robledo's residence").

   d.   According to M.H. and the website of Elite Advisors Sports Management, aka Elite Advisors, aka EASports Management ("Elite Advisors"), ROBLEDO owns and works for Elite Advisors.

   e.   ROBLEDO uses the following email address: fjr@easportsmanagement.com (the "SUBJECT ACCOUNT"), which, based on my review of publically available records from PROVIDER, a person named "Frank Robledo" registered with PROVIDER on or about June 27, 2008.

   f.   On September 8, 2010, M.H. signed a one-year contract with ROBLEDO engaging ROBLEDO to be M.H.'s sports agent.

4

      g.    After the one year term on the contract expired, M.H. verbally continued the contract for an additional year.

      h.    According to M.H., in or around 2011, ROBLEDO conducted a change of address for all mail associated with M.H. to be sent to Robledo's residence.

      i.    Over the next few years, ROBLEDO convinced M.H. to invest approximately $161,000 with ROBLEDO into what were later discovered to be non-existent accounts at Mountain American Credit Union ("MACU") and USAA Investment Management Company ("USAA").

      j.    In March of 2014, M.H. returned to the United States from an LPGA Golf Tournament and discovered that M.H's bank accounts had been drained and M.H's credit cards had been maxed out.  M.H. subsequently contacted the local authorities and the FBI.

## II.  There is Probable Cause to believe that ROBLEDO Committed the SUBJECT OFFENSES

      7.    Based on my review of bank records from accounts in the names of M.H. and ROBLEDO, statements by M.H., and emails between M.H. and ROBLEDO (provided by M.H.), I have discovered that M.H. made at least five separate wire transfers from M.H.'s bank account ending in 359 ("M.H.'s bank account") to defendant ROBLEDO's Wells Fargo account in San Francisco, California, for purposes of investment, as follows: approximately 15,012.51 Euros on or about June 17, 2011; approximately 10,011.01 Euros on or about September 12, 2011; approximately 3,011.01 Euros on or about November 2, 2011; approximately 50,056.71 Euros on or

about January 5, 2012; and approximately 50,206.73 Euros on or
about May 17, 2012.

8.    Based upon my review of emails between ROBLEDO (both
to and from the SUBJECT ACCOUNT) and M.H. (provided by M.H.), I
have discovered numerous statements by ROBLEDO in which he
solicited M.H. for money to invest and assured M.H. that the
money he received from M.H. by wire transfer was invested with
MACU and USAA, including the following:[2]

a.    On or about August 2, 2011, ROBLEDO told M.H.,
"your financial advisor (ME of course) is a freaking genius who
anticipated that the federal debate on the debt ceiling here
would cause the market to still be shaky so I didn't put you
into the market yet, instead I kept most in cash and the other
in more REITS [(Real Estate Investment Trusts)]…"

b.    On or about August 5, 2011, ROBLEDO told M.H.,
"BUT once again who is the bomb dot com. Me of course. We set
up your investments as loans. So what you get back is interest.
Interest can be deducted against regulator income. Also, not
all interested is reported and you may never even get a 1099 at
the end of the year depending on the total revenue that the REIT
generated…"

c.    On or about October 28, 2011, ROBLEDO told M.H.,
"I have an excel spreadsheet of all the money that you have

_____

[2] All statements are recited verbatim unless otherwise
indicated; grammatical and spelling mistakes are as in the
original.

invested, how much interest it has paid you, how much interest it has re-invested and how much you have earned."

    d.   On or about November 22, 2011, ROBLEDO told M.H., "I'm sorry I haven't been able to get you a statement previously.  I had asked them before for a statement but they only give semi annual statements and that's because of all the money that comes in and out its easier for them to do it that way… But don't worry its not fraud… It's legit there's no fraud."

    e.   On or about November 22, 2011, ROBLEDO told M.H., "Anyways so no its not fraud at all.  I'm not stupid I wouldn't risk my entire career and my family to do something like that. Its good, it works and as long as the market keeps sucking like it is right now REITs will keep making a lot of money."

    f.   On or about December 9, 2011, ROBLEDO told M.H., "You have a total of $55,339.20 invested there [(MACU)]."

    g.   On or about March 7, 2012, ROBLEDO told M.H., "Your investment account is all set up and the money will be there by Friday."

    h.   On or about May 17, 2012, ROBLEDO told M.H., "I only could open one of your statements right now from my computer so I asked them to resend the others including just sending it directly to you for your investments but I hope that the cleanup they are doing my computer also fixes that issue and I can just send it to you myself."

    i.   On or about August 23, 2012, ROBLEDO told M.H., "7K? You made much more than that."

j.    On or about January 8, 2013, ROBLEDO told M.H., "No major move and so for now your investments have been holding steady however, I do think we need to start moving money out into safer lower risk (lower paying) investments."

k.    On or about January 22, 2013, ROBLEDO told M.H., "The brokerage account isn't listed on their because I didn't have the statement and dont [know] what the actual balance is but its like $56,000 or so.  So just add 56k to the other amounts and that's what you have total.  You're nuts really. Don't stress out about that stuff just call and ask silly."

l.    On or about November 8, 2013, ROBLEDO told M.H., "all of the investments are in your name."

m.    On or about November 14, 2013, ROBLEDO wrote to M.H., "I called the investment place and we can transfer the money back easily."

n.    On or about March 12, 2014, ROBLEDO wrote to M.H., "In regards to your money let first start off by saying that every single dollar that was ever invested, moved, paid for or done anything else with is 100% accounted for an can be explained fully."

o.    On or March 19, 2014, ROBLEDO wrote to M.H., "I told you that your money was invested in real estate inside real estate trusts, the money is invested in properties and is tied up in escrows, it's not like someone has all this money inside of an account and could just say ok, here you go Maria."

9.    Based on my review of a contract dated January 11, 2012, and accompanying promissory notes provided to me by M.H.,

8

ROBLEDO and M.H. agreed that M.H. would transfer 50,000 Euros to an account owned by ROBLEDO; ROBLEDO would invest these funds in a series of investment vehicles, including stocks, bonds, ETFs, mutual funds, and other similar investments; M.H. would have full access to the funds through USAA.com; and ROBLEDO would provide M.H. with all information on investments and how to access the accounts online.

10. Based upon my review of emails between ROBLEDO and M.H. (provided by M.H.), on or about July 16, 2013, ROBLEDO provided M.H. by email with falsified bank statements, falsified financial reports, and falsified pie charts showing that M.H.'s money was invested with MACU.

11. On July 28, 2014, M.H. received a letter of confirmation from MACU that M.H has never had an investment account with MACU.

12. On July 29, 2014, M.H. received a letter from USAA, in which she was informed that she did not hold any investment accounts with USAA.

13. On October 1, 2014, MACU informed the FBI that ROBLEDO also never had any accounts with MACU listed under his name or social security number.

14. Records I obtained from Wells Fargo indicate that, upon receiving the wire transfers from M.H., ROBLEDO did not invest the funds; rather, statements from ROBLEDO's Wells Fargo account indicate that the money was primarily used to pay credit card bills and write personal checks. The records also reflect

that, by February 28, 2014, ROBLEDO's Wells Fargo account was nearly empty.

15.   According to M.H., in or around March of 2011, per ROBLEDO's recommendation, M.H. opened several bank accounts with Wells Fargo, including a Wells Fargo business checking account ending in 4561 ("M.H.'s Wells Fargo account"), but did not realize ROBLEDO was also adding his name to the accounts.

16.   According to M.H., in or around July of 2012, per ROBLEDO's recommendation, M.H. also opened a Citi Platinum Select/AAdvantage World MasterCard ending in 3471 ("Citi platinum card") and, once again, did not realize that ROBLEDO had added his name to the account.  ROBLEDO convinced M.H. to get the Citi platinum card to start earning credit and airline miles.  M.H. agreed to let ROBLEDO make travel arrangements and attain sponsors for M.H but did not authorize him to spend M.H's money.

17.   On March 13, 2014, M.H. discovered that M.H.'s Wells Fargo account had been drained of $43,300 to partially pay for $50,292 of charges that someone, but not M.H., had made on the Citi platinum card.

18.   According to bank records I obtained from M.H., the Citi platinum card was used to purchase plane tickets, hotel rooms, food, and other items in West Covina (where ROBLEDO lives) and in cities where ROBLEDO traveled by purchasing tickets in ROBLEDO's own name on the Citi platinum card.

19.   LPGA tournament records indicate that M.H. was not in the locations where the credit card was used.

20. According to M.H., M.H. believed that the accounts for M.H's Purdue Federal Credit Union ("PFCU") credit card ending in 3083 ("PFCU credit card") and M.H.'s PFCU debit card ending in 3498 ("PFCU debit card") had both been closed before November of 2013.

21. In or about March of 2014, M.H. learned from PFCU that there was an outstanding balance on the PFCU credit card of approximately $5,974, for which PFCU has since reimbursed M.H. $4,946. Likewise, in or about November of 2014, M.H. discovered that $7,324 was spent out of M.H's checking account at PFCU via the PFCU debit card, for which PFCU has since reimbursed M.H. $6,265. The non-reimbursed amounts appear to be charges made for the benefit of M.H., such as airline tickets.

22. According to Kristen Edmundson, Vice President of Audit and Compliance at PFCU, in order to activate or renew the PFCU credit card and PFCU debit card, someone would have had to answer questions regarding M.H.'s date of birth, social security number, and account number.

23. According to PFCU records, on or about November 25, 2013, the PFCU credit card and PFCU debit card were both renewed on the phone from someone who called from (626) 966-7310.

24. An email from ROBLEDO to M.H., dated November 20, 2013, lists ROBLEDO as the "Branch Manager - Covina" for Carrington Mortgage Services with an office phone number of (626) 966-7310, i.e., the phone number from which someone called to renew the PFCU credit card and PFCU debit card.

11

25. According to a report from PFCU, the person who activated the cards verified the social security number and date of birth of M.H.

26. PFCU online logs from November and December of 2013 indicate that the user, "mariagolf," logged in from the following IP addresses: 198.228.214.138, 198.228.210.163, and 198.228.220.137, which, according to publically available records, are all located in Los Angeles County, California.

27. LPGA records indicate that M.H. was not in Los Angeles, California in November and December of 2013.

28. PFCU records indicate that the PFCU accounts are in the name of M.H. but list Robledo's residence as M.H.'s address.

29. PFCU records also indicate that the PFCU credit card was used to pay for rent for a virtual office through ServCorp in downtown Los Angeles.

30. I have spoken to Christine Mantilla, Team Leader at ServCorp, who remembers that ROBLEDO scheduled a booking for a conference room on or about December 13, 2013. Ms. Mantilla also remembers setting up ROBLEDO's account with ServCorp. Ms. Mantilla was concerned when ROBLEDO wanted to change the payor on the account to M.H. When Ms. Mantilla informed ROBLEDO that ServCorp requires physical proof of identification confirmation for account verification, ROBLEDO sent Ms. Mantilla a copy of M.H.'s driver's license.

31. I have reviewed a ServCorp Virtual Office Service Agreement ("ServCorp Agreement"), signed in ROBLEDO's name and dated December 6, 2013, listing ROBLEDO's billing address as

Robledo's residence.   Under the heading "Company Details," the
ServCorp Agreement lists "Elite Advisors Sports Management" as
the name of the company requesting office space, with Robledo's
residence listed as the street address for the company.   In
addition, the SUBJECT ACCOUNT is listed on the form.   The method
of payment on the ServCorp Agreement lists M.H. as the
cardholder and the PFCU credit card as the card number.

32.   According to Ms. Mantilla, in or around January of
2014, ServCorp cancelled its account with ROBLEDO when it had
not received sufficient payment.

33.   Based on my review of law enforcement business
reports, Elite Advisors no longer has a known office address.

34.   I have spoken with Melissia Buckhalter-Honore, Senior
Counsel, Enforcement, United States Securities and Exchange
Commission ("SEC"), and have examined emails between ROBLEDO and
the SEC, provided by Ms. Buckhalter-Honore.

35.   On August 19, 2014, ROBLEDO emailed the SEC from the
SUBJECT ACCOUNT, stating that he received a subpoena request for
documents that was sent to Robledo's residence.

36.   On December 15, 2014, ROBLEDO wrote an email to the
SEC in which he stated that he had not worked in the capacity of
a financial advisor for the last 10 years.

III. **There is Probable Cause to believe that evidence, fruits,
and instrumentalities of the SUBJECT OFFENSES will be found
within the SUBJECT ACCOUNT**

37.   Based upon my training and experience, and the above-
described information there is probable cause to believe that
evidence, fruits, and instrumentalities of the SUBJECT OFFENSES

13

will be found within the SUBJECT ACCOUNT because the SUBJECT ACCOUNT was used by ROBLEDO for the purposes of soliciting M.H. for money to invest and assuring M.H. that the money he received from M.H. by wire transfer was in fact invested with MACU and USAA. In addition, ROBLEDO listed the SUBJECT ACCOUNT as the contact email address on the ServCorp Agreement, on which he listed M.H. as the cardholder and the PFCU credit card as the card number. The ServCorp Agreement listed Elite Advisors as the name of the company requesting office space, and the SUBJECT ACCOUNT includes the name of Elite Advisors within its domain name.

38. Other than what has been described herein, to my knowledge the United States has not attempted to obtain the contents of the SUBJECT ACCOUNT by other means.

## IV. BACKGROUND REGARDING E-MAIL AND THE PROVIDER

39. In my training and experience, I have learned that the PROVIDER provides a variety of online services, including e-mail, to the public. The PROVIDER allows subscribers to obtain e-mail accounts at the domain name easportsmanagement.com, like the SUBJECT ACCOUNT. Subscribers obtain an account by registering with the PROVIDER. During the registration process, the PROVIDER asks subscribers to provide basic personal information. Therefore, the computers of the PROVIDER are likely to contain stored electronic communications and information concerning subscribers and their use of the PROVIDER's services, such as account access information, e-mail transaction information, and account application information.

In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of the SUBJECT ACCOUNT.

40. In my training and experience, e-mail providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of the SUBJECT ACCOUNT.

41. In my training and experience, e-mail providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the Internet Protocol ("IP") address used to register the account and the IP addresses

associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the SUBJECT ACCOUNT.

42. In my training and experience, e-mail account users will sometimes communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of the SUBJECT ACCOUNT.

43. I know from my training and experience that the complete contents of an e-mail account may be important to establishing the actual user who has dominion and control of that account at a given time. E-mail accounts may be registered in false names or screen names from anywhere in the world with little to no verification by the service provider. They may also be used by multiple people. Given the ease with which e-mail accounts may be created under aliases, and the rarity with which law enforcement has eyewitness testimony about a defendant's use of an e-mail account, investigators often have to rely on circumstantial evidence to show that an individual

was the actual user of a particular account. Only by piecing together information contained in the contents of an account may an investigator establish who the actual user of an account was. Often those pieces will come from a time period before the account was used in the criminal activity. Limiting the scope of the search would, in some instances, prevent the government from identifying the true user of the account and, in other instances, may not provide a defendant with sufficient information to identify other users of the account. Therefore, the contents of a given account, including the e-mail addresses and messages sent to that account, often provides important evidence regarding the actual user's dominion and control of that account. For the purpose of searching for content demonstrating the actual user(s) of the SUBJECT ACCOUNT, I am requesting a warrant requiring the PROVIDER to turn over all information associated with the SUBJECT ACCOUNT with the date restriction included in Attachment B for review by the search team.

44. Relatedly, the government must be allowed to determine whether other individuals had access to the SUBJECT ACCOUNT. If the government were constrained to review only a small subsection of an e-mail account, that small subsection might give the misleading impression that only a single user had access to the account.

45. I also know based on my training and experience that criminals discussing their criminal activity may use slang, short forms (abbreviated words or phrases such as "lol" to

17

express "laugh out loud"), or codewords (which require entire strings or series of e-mail conversations to determine their true meaning) when discussing their crimes.  They can also discuss aspects of the crime without specifically mentioning the crime involved.  In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of an e-mail or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and paren :) to convey a smile or agreement) to discuss matters. "Keyword searches" would not account for any of these possibilities, so actual review of the contents of an e-mail account by law enforcement personnel with information regarding the identified criminal activity, subject to the search procedures set forth in Attachment B, is necessary to find all relevant evidence within the account.

46.  As set forth in Attachment B, I am requesting a warrant that permits the search team to keep the original production from the PROVIDER under seal until the investigation is completed and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral proceeding.

a.   I make that request because I believe it might be impossible for the PROVIDER to authenticate information taken from the SUBJECT ACCOUNT as its business record without the original production to examine.  Even if the PROVIDER kept an original copy at the time of production (against which it could compare against the results of the search at the time of trial),

the government cannot compel the PROVIDER to keep a copy for the entire pendency of the investigation and/or case.  If the original production is destroyed, it may be impossible for the PROVIDER to examine a particular document found by the search team and confirm that it was a business record of the PROVIDER's taken from the SUBJECT ACCOUNT.

   b.   I also know from my training and experience that many e-mail accounts are purged as part of the ordinary course of business by providers.  For example, if an e-mail account is not accessed within a specified time period, it -- and its contents -- may be deleted.  As a consequence, there is a risk that the only record of the contents of an e-mail account might be the production that a provider makes to the government, for example, if a defendant is incarcerated and does not (perhaps cannot) access his or her e-mail account.  Preserving evidence, therefore, would ensure that the government can satisfy its Brady obligations and give the defendant access to evidence that might be used in his or her defense.

## V.   REQUEST FOR NON-DISCLOSURE

   47.   Pursuant to 18 U.S.C. § 2705(b), I request that the Court enter an order commanding the PROVIDER not to notify any person, including the subscriber(s) of the SUBJECT ACCOUNT, of the existence of the warrant because there is reason to believe that such notification will result in: (1) flight from prosecution; (2) destruction of or tampering with evidence; (3) intimidation of potential witnesses; or (4) otherwise seriously jeopardizing the investigation.  The current

investigation set forth above is not public, and I know, based on my training and experience, that those who commit fraud often will destroy evidence if they learn they are under investigation by law enforcement authorities.  In addition, if the PROVIDER or other person notifies the targets of the investigation that a warrant has been issued for the SUBJECT ACCOUNTS, the fraud suspects might further mask their activity and seriously jeopardize the investigation.

## VI.   CONCLUSION

48.  Based on the foregoing, I request that the Court issue the requested search warrant.

HENRY R. WALDHEIM
Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
on March ___, 2015.

HONORABLE MICHAEL R. WILNER
UNITED STATES MAGISTRATE JUDGE